**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK ERWIN GARNER, | Case No.: 1:20-cv-01403-NONE-JLT (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| BRIAN CATES, Acting Warden, | [THIRTY-DAY OBJECTION DEADLINE] |
| Respondent. | |

Petitioner was convicted of rape, eight counts of aggravated sexual offenses against a minor under age fourteen, and incest. As discussed below, the Court finds the Petitioner's claims to be without merit and recommends the petition be **DENIED**.

# I.      PROCEDURAL HISTORY

Petitioner was tried twice on offenses related to his sexual abuse of his daughters. (Doc. 13 at 11.) In 2011, Petitioner stood trial for eight felony offenses related to his sexual abuse of his developmentally delayed or disabled daughter, "Jane," which occurred during two separate time periods: 2004 and 2009. (<u>Id</u>.) A jury convicted him of three offenses he committed during the 2009 period: rape by force or fear, rape of a person incapable of giving legal consent, and incest. (<u>Id</u>.) The jury deadlocked on three counts related to the 2004 period, resulting in a mistrial, and the trial court granted the prosecution's motion to dismiss two other counts. (<u>Id</u>.) The trial court sentenced Petitioner to eight years in prison. (<u>Id</u>.) The California Court of Appeal, Fifth Appellate District ("Fifth DCA")

affirmed the convictions and sentence. <u>People v. Garner</u>, No. F075590, 2019 Cal. App. Unpub. LEXIS 3305 (May 13, 2019).

In 2017, Petitioner stood trial on the two counts that led to the prior mistrial, as well as eight new counts related to his sexual abuse of another daughter, referred to as "M.Ga." (Doc. 13 at 11.) The jury convicted Petitioner on all counts, and the trial court sentenced him to an aggregate term of 135 years to life in prison, to be served consecutively to his eight-year prison sentence. (<u>Id</u>.) The Fifth DCA affirmed the judgment, and the California Supreme Court denied discretionary review. (<u>Id</u>.)

Petitioner filed the instant habeas petition on October 2, 2020. (Doc. 1.) In response to an order by this Court, the Respondent filed an answer on January 20, 2021. (Doc. 13.) On March 22, 2021, Petitioner filed a traverse. (Doc. 18.)

## II.      FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

Defendant and his first wife, M. ("mother"), had four children: a son, M.G., and three daughters: Jane, M.Gr., and M.Ga.

Jane was developmentally disabled and could not take care of herself.

In 1989 or 1990, defendant and mother were living in Illinois and divorced. Defendant obtained sole custody of their four children.

In 1995, defendant married K. (stepmother). Stepmother had children of her own: A. (a daughter who is also developmentally delayed), daughter Natasha, and two sons, John and Christopher; they also moved in with the family. Defendant, stepmother, the children and stepchildren moved around, living in several places, including Easton and Chowchilla.

In approximately 1998, M.Ga. and M.Gr. were in middle school when they ran away from defendant's home in Chowchilla and went to live with mother in Stockton. Jane remained in defendant's home.

Defendant told his son that mother was making things up to get the children. M.G. believed defendant because he did not speak to his mother.

**Jane's Pregnancy**

In 2004, defendant and stepmother were living in Chowchilla with Jane and stepmother's children. Jane became pregnant and gave birth to a child that year. The child was adopted by another family.

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will adopt the Fifth DCA's summary of the facts.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

At the time of Jane's pregnancy, defendant told his sister, Betty C., that Jane was pregnant. Defendant said Jane had slept over at "friends' house[s] who are similar to her in nature," and a friend of one of the fathers took advantage of Jane.

**DEFENDANT'S CONFESSION**

Defendant operated a truck repair business and workshop. M.G. worked with him daily, and John worked at the shop occasionally.

**Stepmother Sees Defendant Leave Jane's Bedroom**

On or about the night of April 23, 2009, stepmother saw Jane run out of her bedroom. Jane went into the bathroom and locked the door behind her. Defendant followed Jane out of her bedroom.

Stepmother later reported to a deputy that she told defendant that "she didn't know what was going on, but it was wrong and it needed to stop."

**Defendant Meets with Dr. Streeter**

On April 24, 2009, defendant met with Dr. Susan Streeter, a licensed psychologist in Fresno. Dr. Streeter had never met defendant before. Dr. Streeter testified defendant called her office and said he needed an appointment "as soon as possible." Dr. Streeter testified that defendant sounded "very anxious and in distress," and "repeated a couple of times that he really needed help."

When defendant arrived for the appointment, Dr. Streeter noticed his clothing was soiled and he looked like he just got out of work. Dr. Streeter asked defendant to fill out paperwork, including a document that stated the session would be confidential, but she was mandated to report any disclosures if she believed a person was a danger to himself or others, or if she suspected child or adult abuse. Defendant completed the paperwork and then went into her private office. Dr. Streeter reviewed the confidentiality information with defendant and he said that he understood.

Dr. Streeter testified defendant starting "spewing a lot of information that was obviously bothering him," and she did not have to ask many questions because he just kept talking, and she took notes about his statements.

Dr. Streeter testified defendant said he had been having sex with his daughter, Jane, for 10 years, and that Jane had some kind of developmental delay problems. Defendant said he had sex with his wife twice a week, and that he would have sexual intercourse with Jane much more frequently. Jane had complained of pain during one incident.

Defendant said that Jane had a child about four years earlier. Defendant said he did not know who the child's father was, but that "he was more than likely the father of the child."

Defendant told Dr. Streeter that he had sex with Jane the previous day, and his wife figured out he had done something with Jane. Defendant said Jane slept in the same bedroom as A. Defendant said he went into Jane's bedroom, it was very late, and his wife woke up. His wife confronted him and threatened to call the police. Defendant told his wife to go ahead and call them "'because I'm the wage earner. I'm the provider.'"

Defendant told Dr. Streeter about something else that happened the previous night - he also tried to have sex with Natasha. Defendant said he was helping Natasha go to bed and she started to kiss him. Defendant felt very attracted to her.

3

Defendant said he was afraid because "his wife had said something about he could go to jail for having relations with [Jane]." Defendant "described it as having a problem" with Jane, and that Jane was like a 16- or 17-year-old.

Defendant said having sex with Jane was like "watching porn. It was wanting to be caught" by his wife. Defendant said he wanted to stop because he was afraid that if his wife reported him, he would be thrown in jail for a long time.

Dr. Streeter testified she was shocked by defendant's disclosures because "most people don't just come in and just spontaneously start talking" about inappropriate sexual behavior.

Dr. Streeter testified as defendant made these disclosures, he moved to the edge of the sofa where he was sitting, and she suddenly got a very strong alcohol smell from him. At times, defendant gave the impression that he might have been on another substance because his speech was so rapid.

Defendant said he was taking Soma and Vicodin and was also drinking a significant amount of alcohol because he had some type of pain. Defendant said the medication was not providing any relief, and his drinking had markedly increased.

Dr. Streeter believed defendant was intoxicated but testified he "was crystal clear," he did not slur his speech, and she did not have any concerns about his ability to provide these disclosures and understand what was going on.

Dr. Streeter's session with defendant lasted for one hour. She scheduled another appointment for May 10, 2009, and suggested defendant attend Narcotics Anonymous.

**Dr. Streeter Reports Defendant**

On the same day of defendant's appointment, Dr. Streeter called the Madera County Sheriff's Department and reported defendant's confession that he was having sex with his daughter, Jane.

**Defendant's Statements to his Stepson, John**

John testified about a series of telephone calls that occurred one day in April 2009, around the time defendant met with Dr. Streeter.

In the morning, John received a call from his brother Christopher, another of defendant's adult stepsons. Christopher said something had happened involving a female in the family. John became concerned, called his wife, and told her about the information he had received from Christopher.

On that same day, defendant called John and said, "'I don't know what you heard, but it's not true. Nothing has happened.'"

John testified defendant called him again around 5:30 p.m. the same day. This time, defendant said "something did happen, and that if I didn't show up to work [with him] the next day, he would understand."

John testified he was stunned after hearing this information from defendant. He did not return to work the next day and stopped talking to half the family.

**M.G. Talks to Defendant and Jane**

M.G. testified that he was at work with defendant when he received a telephone call

about certain information. He felt sick to his stomach about the information. Before he had received the telephone call, M.G. had noticed that defendant was acting as if something was bothering him, and he was on the phone quite a bit.

After receiving the call, M.G. confronted defendant and asked if he had been having sex with Jane. Defendant looked surprised and shocked. Defendant said it was a lie and he would never do that, and he left the workshop.

M.G. drove to defendant's house, contacted Jane, and said they needed to talk. They got into his car, and he asked Jane if defendant had been having sex with her. M.G. testified Jane started to cry. She said she tried kicking defendant off, but he would not stop. M.G. told Jane that she did not have to worry about it anymore; she was going to live with his family, and defendant would not touch her again. He immediately drove Jane to his house without even going into defendant's home to collect Jane's possessions.

M.G. then called defendant and asked why he lied about having sex with Jane. M.G. testified that defendant started to cry and said he had been lying to himself for a long time. Defendant said he had a problem since before M.G. was born. Defendant said he had gone to a therapist to get help.

Jane moved in with M.G. and his family that day, and she never returned to defendant's house.

**Defendant's Statements to his Sister**

Betty lived in San Diego. In April 2009, she received a call from M.G., who was very anxious, upset, and a little frightened. M.G. said he had picked up Jane and moved her from defendant's house; he needed affirmation that he had done the right thing.

As Betty talked to M.G., another call came through her line - it was defendant. Betty took the call and thought defendant sounded upset and anxious. Defendant said M.G. had picked up Jane and she was going to live with him and his family.

Betty testified that defendant said "he was having [an] inappropriate relationship with [Jane]. And ... he wasn't quite sure what was going to be happening." Defendant said he went to a therapist "because he had been having relations" with Jane.

Betty asked defendant "how long it had been going on," and defendant said "awhile." She asked defendant if Jane's child, who was born in 2004, "could be his." Defendant replied that "he didn't know" and "I'm not sure."

Betty testified that defendant was arrested on the evening of her telephone conversation with him.

**THE INVESTIGATION**

**Stepmother's Initial Statement**

Deputy Rodriguez of the Madera County Sheriff's Department testified that on the evening of April 24, 2009, he was dispatched to defendant's house in Chowchilla based on a report made that day by Dr. Streeter.

Deputy Rodriguez spoke to stepmother about something that had happened the previous night. Stepmother reported she was asleep on the couch and woke up to the sound of the television. She also heard a noise coming from Jane's bedroom and went to check on her. She said Jane was 27 years old and developmentally disabled. She said Jane

shared a bedroom with A.

Stepmother said she got to Jane's bedroom door and before she could open it, Jane "ran out of the bedroom and into the bathroom locking the door behind her." Stepmother said defendant "followed" Jane out of her bedroom and began to walk to their own bedroom.

Deputy Rodriguez testified that stepmother said she told defendant that "she didn't know what was going on, but it was wrong and it needed to stop." She said defendant went into their bedroom. Jane came out of the bathroom, and stepmother asked what she was doing. Jane said she had to use the bathroom and went back into her bedroom.

**Defendant's Arrest**

Deputy Rodriguez arrested defendant on April 24, 2009, for incest. Defendant posted bail within a few hours of his arrest.

Deputy Rodriguez determined Jane was out of defendant's house and staying with her brother. Rodriguez went to several locations and tried to locate Natasha, but he never interviewed her.

**Betty Talks to Defendant**

On the day after defendant's arrest, Betty drove to Chowchilla to see defendant and his family. Defendant told Betty he was sorry and apologized to her. They also discussed who would take care of their elderly father, who was living in defendant's house.

**Sergeant Clark's Interview with M.Gr.**

Sergeant Jason Clark testified that he interviewed M.Gr. on or about May 12, 2009, in Stockton.

M.Gr. said defendant had sexual intercourse with her when she was between the ages of five and seven years old, when the family lived in Illinois. She said defendant also had intercourse with her when they lived in Easton, and he would put pornography on the television when these incidents occurred. She said she felt ashamed and embarrassed.

M.Gr. said that at one point, she told a police officer in Fresno about what was going on. Two officers came to talk to her, and she became embarrassed and recanted. She said that after she made the report, defendant beat her to the point that Child Protective Services (CPS) placed her in foster care. However, she was later returned to defendant. M.Gr. said after that incident, defendant did not sexually assault her between the ages of 10 and 14 years, but he physically abused her.

M.Gr. said that when she was 14 years old and they were living in Chowchilla, she stayed home one day because she was sick. Defendant turned on pornography and called her to the couch. She saw the belt next to the couch and knew that he would beat her with the belt if she did not cooperate. Defendant removed her clothes and placed his finger into her vagina for five to 10 minutes, until she built up the courage to run away. She grabbed her clothes and went outside. Defendant tried to find her, but she was hiding from him.

M.Gr. said that after defendant went to work, she convinced stepmother to let her stay at a friend's house. Instead, M.Gr. went to school and got M.Ga., and they went to Stockton to stay with their mother. M.Gr. said she never returned to Chowchilla as a child.

6

**Sergeant Clark's Interview with Stepmother**

Sergeant Clark testified that on May 29, 2009, he interviewed stepmother. She was very clear when she answered questions about what happened the night before defendant was arrested.

Stepmother's statement was consistent with her report to Deputy Rodriguez. She said that on the night before defendant was arrested, she was sleeping on the couch, she woke up, heard a noise down the hallway, and went to Jane's room to check on her. Jane ran out of her bedroom, went into the bathroom, and shut the door. Defendant walked out of Jane's bedroom. Stepmother said she told defendant, "'Whatever you're doing is wrong.'"

Sergeant Clark asked stepmother what she thought defendant was doing. She said she did not know and did not see anything.

## JANE'S TRIAL TESTIMONY

At the second jury trial, as alleged in the fourth amended information, defendant was tried and convicted of two counts based on sexually assaulting Jane: count 1, rape by force, violence, and fear of immediate and unlawful bodily injury (§ 261, subd. (a)(2)); and count 2, willful, unlawful, and incestuous sexual intercourse (§ 285).

Both counts were alleged to have occurred between October 18, 2003, and October 17, 2004, the period where Jane became pregnant and gave birth to her child, and the same period when defendant admitted to Dr. Streeter and Betty that he could have been the child's father. The jury in the first trial had been unable to reach verdicts on these counts.

**Jane's Testimony about the Sexual Assaults**

At the second trial, Jane testified that she was 35 years old and used to live in Chowchilla with defendant, her stepmother, and stepsiblings. Jane had shared a bedroom with A.

Jane testified that when she was younger, she lived with her sisters, M.Ga. and M.Gr.. They moved out when she was 19 years old, and she did not have any contact with them after that.

Jane testified defendant regularly had sexual intercourse with her when she lived in his house in Chowchilla and used vernacular terms to describe the nature of the sexual acts. Jane could not remember how old she was when defendant started having sex with her. Defendant had sexual intercourse with her "all the time" until she moved out of defendant's house in April 2009.

Jane testified these acts occurred in the bedroom she shared with A., who was asleep and never woke up. Defendant came into the bedroom at night when everyone was asleep. He removed their clothes, got on the bed, and had sexual intercourse with her. She would tell him to stop.
Jane testified it made her feel "sick" and "yucky" when defendant had sex with her; she did not want him to do these things to her. Defendant had sex with her more than once, but Jane could not remember how often it occurred.

Jane never told A. what defendant did to her because she did not want A. to worry. Jane never told stepmother about what was happening because she was afraid stepmother would get angry at her.

Jane testified she gave birth to a child in October 2004. Jane did not know who the

child's father was, but thought it could be either defendant or her friend, D. Jane testified defendant had sexual intercourse with her before she had the baby; she could not recall how many times it happened before she gave birth. She knew the child had been adopted by someone.

Jane testified that the final time defendant got onto the bed and had sex with her, she kicked him in the stomach and told him to stop. Defendant got back on top of her, and she again told him to stop. Her stepmother came into her bedroom room because she heard something, and defendant ran out.

Jane testified that shortly after this final incident, her brother picked her up and took her to his house to live with his family.

**Jane's Current Status**

As of the second trial, Jane still lived with her brother's family. She stayed in a small guesthouse in the backyard with her boyfriend. She occasionally helped neighbors clean their homes and received assistance checks because of her developmental disabilities.

Jane testified that after she moved in with her brother, she did not communicate with her stepmother or stepsiblings and did not want them to know where she was because they would make her return. Jane testified they always made her do all the chores when she lived at the Chowchilla house.

"[DEFENSE COUNSEL]. [H]aving sex with [defendant] was something that really happened or something that you made up because you were mad about the chores?

"[JANE]. It happened."

**SEXUAL MOLESTATION OF M.Ga.**

In the second trial, defendant was charged and convicted of eight counts based on sexually assaulting M.Ga., who was a child under the age of 14 years and more than 10 years younger than defendant at the time he committed the following offenses:

Counts 3 and 4: rape, between November 15, 1995, and November 14, 1996, "to wit: the first time" and "the last time" (§ 269, subd. (a)(1); § 261, subd. (a));

Counts 5 and 6: rape, between November 15, 1996, and November 14, 1997, "to wit: the first time" and "the last time" (§ 269, subd. (a)(1); § 261, subd. (a));

Counts 7 and 8: sexual penetration by force, violence, duress, menace, and fear of immediate and unlawful bodily injury, between November 15, 1995, and November 14, 1996, "to wit: the first time" and "the last time" (§ 269, subd. (a)(5); § 289, subd. (a)); and

Counts 9 and 10: sexual penetration by force, violence, duress, menace, and fear of immediate and unlawful bodily injury, between November 15, 1996, and November 14, 1997, "to wit: the first time" and "the last time" (§ 269, subd. (a)(5); § 289, subd. (a)).

**M.Ga.'s Trial Testimony**

M.Ga. appeared at the second trial and testified against defendant. She was 30 years old at the time of the second trial. She testified that she used to live in Chowchilla with defendant, her stepmother, her sisters, and her stepsiblings.

M.Ga. testified that when she lived in Chowchilla, she ran away many times because she did not like "the whole thing" and "looking at" defendant.

"Q. Was he doing something to you that you didn't like?

"A. Yeah. And I'd rather not go into the details because I can't. I'd rather not go into. [¶] ... [¶]

"Q. Why do you not want to go into details?

"A. Because it's embarrassing and it's gross.

"Q. [W]hen did those things start happening with you?

"A. They ... they've been happening everywhere; everywhere we moved; everywhere we went. Every ... everywhere. Because no one was listening to me."

M.Ga. testified that defendant touched her sexually "pretty much all the time. Every chance he got."

The prosecutor asked M.Ga. a series of questions about how and where defendant touched her. She testified that defendant removed her clothes, used his hand to touch the lower part of her body, and described the part of her body that started with a "V" and where she went "pee." Defendant moved his finger back and forth inside her body. He did this once a day. These incidents happened in her bedroom when no one else was there. Defendant did this in the daytime and the nighttime, "[w]henever he got a chance." She felt disgusted and tried to pull up her clothes, but he would push them down again. She repeatedly told defendant to stop, but he would not listen to her. When defendant finally ended each act, he told her not to tell anyone and walked out of the bedroom. The prosecutor next asked M.Ga. if she made prior statements to Sergeant Clark about whether her mouth touched defendant. She said she could not remember what she told Clark, but "[i]f that's what I said, then that's what happened but at this time it's just dropping, it's all hitting me. And so I'm not sure if that's what I said at that time. And I was honest. I just don't want to look as if I'm lying because I'm not. I just don't recall. If that's what I said, then that's what happened."

In response to additional questions, M.Ga. testified that defendant put his penis in her mouth. It happened in her bedroom; it was "gross," and she did not want to talk about it.

The prosecutor asked M.Ga. if she told Sergeant Clark that defendant touched another part of her body. She testified that she could not remember what she said, but she told the truth and knew "this is no joke. Why would I lie about something like this? And why would somebody ... do time that I'm lying about and I wouldn't." M.Ga. testified she could not stop defendant because she was little and no one listened to her. She tried to pull away from him, but he was stronger.

When M.Ga. was seven or eight years old, she went by herself to the police station in Chowchilla and "told the police" that defendant was touching her. "And I didn't show up to school. And I told somebody and when they came out to the house they didn't believe me. All they said is do I got proof. And all because I didn't have proof or they didn't even try to check it out. And ... now is the time I'm going through this and it should have been through this a long time ago."

"Q. What should have stopped when you were seven or eight?

9

"A. Everything. Him abusing us."

M.Ga. testified that defendant previously told her he would "beat me black and blue until I bled" if she told anyone about what he did. When defendant found out she talked to the police, he beat her bare bottom with a belt so hard that she was bleeding. Defendant did not say anything to her while he beat her because he had already said that he would do it if she told anyone, and "I didn't listen to him, so I told someone." After the beating, she ran into a nearby orchard and spent the night hiding in a tree. She returned to the house the next morning.

M.Ga. testified that defendant did not touch her again until the scars on her body from the beating had healed. After the wounds healed, defendant started to put his finger inside her vagina again. She tried to tell her brother, but he did not believe her. She did not tell a teacher or school counselor because they could not do anything different than the police, and the police had not listened to her.

M.Ga. testified that she told her mother about the incidents at one point, but defendant took her away from her mother, and she did not see her again for many years.

In response to further questions, M.Ga. again testified that defendant put his penis inside her vagina, and that it happened more than once: "Whenever he'd get a chance." The first time it happened she was in defendant's bedroom, it was nighttime, no one else was around, and she was in middle school. She could not remember what happened during each incident when he performed that act; she did not want to talk about it at trial. It hurt her too much to talk about it. She always told defendant not to do it, but she could not get away from him.

As M.Ga. described these incidents, she suddenly said, "I just can't believe he would do that. I used to love him."

M.Ga. testified defendant never stopped sexually touching her until she ran away from his home in Chowchilla and went to live in her mother's house in Stockton. She believed she was between the seventh and eighth grades when she ran away. M.Gr. was two years older and "got me out of school," so they could leave with their stepfather. They tried to get Jane to leave, too, but she was afraid to come. M.Ga. and M.Gr. went to live in their mother's home.

As of the second trial, M.Ga. had not seen or talked to Jane for a few years because M.G. would not let M.Ga. see her. She never contacted defendant or his wife after she ran away, and she never asked them for money. No one told M.Ga. what to say.

**Testimony of Mother**

Mother testified that in the summer of 1998, her daughters, M.Ga. and M.Gr., ran away from defendant's home in Chowchilla. M.Ga. was 13 years old and in middle school at that time. Her daughters called her husband, and he picked them up. The girls moved in with mother and her husband, and she enrolled them in middle school in 1998.

Mother testified that the girls told her why they ran away from defendant, and both girls gave the same reason. M.Ga. said, "[t]hey had to get away from their dad because he'd be touching them and messing with them and having them do things ... they didn't want to do. So ... they ran away because nobody would believe them."

Mother was upset because this was "something that we were trying to get taken care of and nobody would believe us." She previously tried telling attorneys, police, and the sheriff's department, but "[t]he truth don't sound as good as a lie does."

Mother tried to get Jane out of defendant's house, but defendant "kept her from me." Jane visited mother after the two girls had moved to Stockton. Mother testified Jane did not want to go back to defendant, and they were referred to a "shelter." Mother testified Jane's words "were twisted," she was "called a liar," and she was returned to defendant. Mother was distraught when Jane was returned to defendant, but there was nothing she could do.

Mother testified that after the two girls moved in with her, she made reports about their statements to the police in Chowchilla, Stockton, Turlock and Modesto. She testified that they were considered liars because defendant and mother had divorce issues, and defendant "had them thinking that I just said all these things because I wanted to get my kids."

**EVIDENCE OF PRIOR SEXUAL ASSAULTS**

At defendant's first trial, M.Gr. testified that he had also sexually assaulted her. M.Gr.'s testimony was admitted pursuant to Evidence Code section 1108.

At his second trial, M.Gr. refused to appear, and the court found she was unavailable. The court granted the prosecution's motion to read her testimony from the first trial to the jury. The court again found the evidence was admissible pursuant to Evidence Code section 1108. Thereafter, the entirety of M.Gr.'s testimony from the first trial was read aloud to the jury at the second trial.

**M.Gr.**

M.Gr. was 27 years old at the time of the first trial and repeatedly stated she did not want to testify. She had been taken into custody on a bench warrant for failing to appear.

The prosecutor asked M.Gr. if she told Detective Clark that defendant molested her when she was little. She responded: "Damn you, Dad. [¶] I don't want to do this. I don't want to do this." She added: "Dad, why couldn't we just have been normal? Why couldn't we just been a normal family?"

M.Gr. admitted that she told Detective Clark that defendant molested her. The prosecutor again asked if defendant molested her. She replied: "What does it matter anymore? Nobody cared when I tried to say something, so why all of a sudden 20 more years down the line does anybody care?" The prosecutor asked her if she had forgiven her father for what he did to her when she was little. She said yes and explained: "You got to forgive to forget...."

M.Gr. did not remember telling Detective Clark about an incident that occurred when she was 14 years old. She stayed home from school because she was sick, defendant played a pornographic movie and threatened her with a belt, and he molested her. She said Clark was lying about that story. However, she testified she saw "porn," but defendant "didn't start nothing again." She said she would have been afraid of "the shame" and not the belt.

M.Gr. testified that she was 14 years old when she left defendant's home and moved in with her mother. "If I could have got [Jane] I would have got [her], but I couldn't get [her]. [¶] ... [¶] They don't let her out of their sight. She's on lockdown out there."

"Q. Why did you want to take her?

"A. What are we sitting here today for? To prevent all this."

The prosecutor asked M.Gr. for her age when defendant first molested her. She replied: "I hate you, Dad. I hate you, Dad. I hate you." She testified she was little, she did not know how old she was, and she told him to stop.

On further questioning, M.Gr. testified the family lived in Illinois when she was six or seven years old. During that time, defendant took her and her sister from their bedroom to watch pornography on television. She did not remember anything that happened afterwards and blocked it out of her mind.

At the time of the first trial, M.Gr. had been working for defendant's diesel mechanic business. Her children would take the school bus to the business, and then she would take them home. She denied that defendant was around her children.

**ADDITIONAL PROSECUTION EVIDENCE**

**Prior Reports**

The prosecution introduced evidence that on August 1, 1989, Jane and her mother went to the Turlock Police Department. Officer Sue Whitmer met separately with Jane. Whitmer testified Jane was crying, and she was very uncomfortable at the police department. It was very difficult to understand Jane because of some sort of speech problem and developmental disability.

Officer Whitmer then met with Jane and her mother and noticed Jane had calmed down. Whitmer made an appointment for them to return the following day. However, Jane and her mother did not return.

Sergeant Clark testified he sent a request to the Department of Justice about any prior reports regarding defendant. He determined there had been several reports made to law enforcement agencies in Tulare, and Fresno and Stanislaus CPS agencies. The actual reports had been purged with the exception of one report with the Turlock Police Department that was relevant to Jane and defendant.

**Stepmother's Testimony**

Stepmother was called as a prosecution witness and testified that she recalled talking to deputies and detectives about accusations regarding Jane, but she could not remember what she said. When asked to review a report to refresh her memory, stepmother testified that the report was not accurate.

Stepmother knew that M.G. removed Jane from their house, but testified the entire incident occurred because "one kid [was] telling another kid and another kid. It was like a chain reaction. One kid called someone else's house and then someone else's house, and it kind of just did a big loop." She never saw defendant do anything inappropriate to Jane, M.Ga., or M.Gr.

Stepmother testified the night before Jane left their house, she fell asleep on the couch and woke up from the sound of the television. She thought she heard a bang and went to check on defendant's elderly father, who also lived in the house. Jane suddenly ran out of her bedroom and almost knocked over stepmother. She asked Jane what she was doing. Jane was laughing and said she had to use the bathroom. Stepmother checked on her father-in-law, and Jane went back to her bedroom. Stepmother testified she never saw defendant in or leaving Jane's bedroom that night.

Stepmother testified she never told defendant that "she did not know what was going on, but it was wrong." Instead, she used the term that something wasn't "right" to

describe hearing the wind or a bang outside the house.

Stepmother could not recall if she told the deputies that she saw defendant walking out of Jane's bedroom. When again asked to review a report, she testified that the report was not factual, "a lot of stuff has changed," and things had been left out.

Stepmother testified defendant was "picked up" that day and held "just briefly." The deputies were also looking for her daughter, Natasha.

**Defendant's Postarrest Statements to M.G.**

M.G. testified that he continued to work for defendant after he was arrested and released on bail. He continued to do so until 2010, because the economy was bad, and he needed a job.

M.G. testified that he used to ask defendant what he was going to do about his case and whether he would he take a deal. "And [defendant] would kind of roundabout like he was going to get away with it."

M.G. testified that he never told M.Gr. or M.Ga. to testify against defendant. After Jane moved into his house, M.Gr. obtained a restraining order against M.G. in 2011 claiming he had threatened her. M.G. testified that by that time, M.Gr. was working with defendant, and he believed she was trying to discredit M.G. prior to defendant's trial.

**DEFENSE EVIDENCE**

The prosecutor from the first trial, Sally Moreno, testified that M.Gr. was in custody when she testified during the first trial. She failed to respond to the subpoena, did not want to testify, and was represented by counsel. Moreno testified that when M.Gr. appeared at the first trial, she gave "some of the most emotionally impact-ful testimony I have ever experienced," and she looked fearful and kind of "like a frightened animal; she just wanted to get away any way she could." M.Gr. was released from custody at the end of her testimony.

April C. testified that she dated M.G. when they were in high school. She often visited defendant's house and never observed defendant engage in inappropriate conduct with any of his children or stepchildren. She testified that mother "coerced" M.Ga. and M.Gr. to leave defendant's house.

April testified that she saw M.G. after defendant was arrested. M.G. said he could make the charges go away, and he would take care of stepmother with $5,000 per month, in exchange for ownership of defendant's business.

On cross-examination, April conceded she did not know that defendant told a therapist that he had sexual relations with Jane for 10 years, or that defendant told his sister he did not know if he was the father of Jane's child. She testified her opinion of him would change with those facts.

M.G.'s wife was recalled as a defense witness and testified they received a total of $720 per month in rent from the Social Security payments received by Jane and her boyfriend.

A. testified that she shared a room with Jane for over one year, and defendant never came into their room at night. She never saw defendant come into the bedroom or get into Jane's bed.

Stepmother was recalled as a defense witness and testified that M.Ga. and M.Gr. ran

13

away from home because there were fewer rules at their mother's house, and they got to do what they wanted. She testified that both girls regularly returned to visit them in Chowchilla after they ran away and when they were still children.

Ralph Cernuda, a volunteer chaplain, testified he met defendant while teaching inmates about the Bible at the Madera County Jail. During the previous five years, defendant was an incredible Bible teacher. Cernuda would trust defendant with his life and believed he was an honest person.

Mother was recalled by the defense and denied that she applied for a credit card in defendant's name after he was arrested in this case.

**Defendant's Testimony**

Defendant testified that after he separated from mother, he obtained sole custody of their son and three daughters. They moved from Illinois to Easton in 1992, and then moved to Chowchilla. On December 15, 1997, defendant reported to the Stockton Police Department that M.Ga. and M.Gr. ran away from home. He believed the two girls again ran away in 1998. M.Ga. and M.Gr. never accused him of sexually molesting them. Defendant believed their mother made accusations against him and used the two girls to get money from the government. Defendant also claimed M.Ga. and M.Gr. frequently visited his house after they started to live with their mother, and when they were still children.

Defendant gave M.G. a 10 percent interest in his business. They did not have any agreement that M.G. would get the business if defendant could not participate. Defendant claimed M.G. put conditions on him - that he would get in trouble if he did not do certain things.

Defendant testified that in April 2009, he believed his adult stepdaughter, Natasha, was suicidal because she was going through a divorce and had financial problems. Natasha was staying at their house. One night, he helped her get to bed because she was having such a hard time. She kissed him, and he felt bad about it; he immediately told his wife.

The following day, defendant called three psychologists to get help for Natasha because he was afraid she would commit suicide. Dr. Streeter returned his call, and he went to see her to get information to help Natasha.

Defendant testified he only met with Dr. Streeter for 10 to 15 minutes, and she misunderstood everything he said during their appointment. Dr. Streeter sat on his left side, and he was deaf in his left ear and could not hear her questions. Defendant identified the members of his family, and his children and stepchildren. He told Dr. Streeter about Jane, her mental capacity, and that she had a baby. Dr. Streeter asked defendant if he knew the father's identity and he said no. They discussed the incident where Natasha kissed him. Dr. Streeter started to use the phrase "inappropriate relations" regarding Natasha and accused him of being the father of Jane's baby. Defendant tried to tell her that she was wrong, and he never said that he was the father of Jane's child or did anything wrong to Natasha.

Defendant testified he never told Dr. Streeter that he attempted to have sex with Natasha; he never told her he had been having sex with Jane for 10 years; that he could be the father of Jane's baby; or his wife caught him leaving Jane's bedroom the previous night.

"[THE PROSECUTOR] Well, from your point of view, what's the reason for [Dr. Streeter] making all this up?

14

"[DEFENDANT] Well, part of it was a misunderstanding. A miscommunication between the two of us. And the other part of it. I - I don't know what her frame of mind is. She said she did this [type of reporting] 20 or 30 times before. So I don't know her history. But we spent over ten to 15 minutes asking ... I told her that I didn't say that and she was repeating me back what her memory was. Or, you know, what she felt I had said. So that's the way the meeting was left hanging. Come back May 1st on the next appointment."

Defendant was taking pain medication at the time of the appointment. He had not been drinking. Dr. Streeter told him to enroll in Narcotics Anonymous. Defendant was arrested that night and immediately released on bail.

Defendant acknowledged he talked to his sister and told her Jane would be living with M.G. He never said that he had sexual relations with Jane or that he could be the father of her child.

On cross-examination, defendant admitted he had been convicted of two counts of rape and one count of incest.

People v. Garner, 2019 Cal. App. Unpub. LEXIS 3305, at *3-36.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.   Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Cullen v. Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker,

501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.     Review of Petition

1.     Evidentiary and Instructional Error

Petitioner claims that the trial court violated his due process rights to a fair trial "by allowing the prosecution to impeach him with evidence of his prior rape and incest convictions involving [Jane], and compounded that error by instructing jury [*sic*] on prior sex crimes evidence." (Doc. 1 at 3.) In the last reasoned decision, the Fifth DCA denied the claim as follows:

### I. **Defendant's Prior Convictions**

Defendant contends the court committed prejudicial error by allowing the prosecutor to impeach his trial testimony with evidence that he was convicted "for his prior sexual offenses against [Jane]." Defendant argues the prior offenses were prejudicial because they were identical to the charged offenses, and the jury could have inferred that Jane was the victim in the prior offenses.

As we will explain, defendant was properly impeached, and the jury was not advised that Jane was the victim of the prior convictions.

*A. Defendant's Prior Convictions and Sentence*

As explained above, in the first trial, defendant was charged with sexually assaulting Jane in 2004 and 2009. M.Gr. and M.Ga. testified at the first trial pursuant to Evidence Code section 1108, that defendant also sexually assaulted them when they were children.

Defendant was convicted of committing the following offenses against Jane in 2009: count 5, rape by force or fear (§ 261, subd. (a)(2)); count 6, rape of a person incapable of giving legal consent because of a mental disorder or a developmental and physical disability (§ 261, subd. (a)(1)); and count 8, incest (§ 285). The jury was deadlocked on three counts based on the 2004 incidents.

Defendant was sentenced to the upper term of eight years for count 5. The court stayed the terms imposed for counts 6 and 8.

*B. The Court's Evidentiary Rulings for the Second Trial*

17

At the second trial, defendant was retried for the charges based on sexually assaulting Jane in 2004 and tried on the new charges of sexually assaulting M.Ga. when she was a child between 1995 and 1997.

Prior to the start of the second trial, the prosecutor stated that Jane and M.Ga., the victims of the charged offenses, would testify that defendant sexually assaulted them when they were children, in "a continuing course of conduct by the defendant." M.Gr. would also testify that defendant sexually molested her pursuant to Evidence Code section 1108. The People's theory was "that [M.Gr.] is 1108 evidence as to both [M.Ga. and Jane]; and that [M.Ga.] is 1108 to what happened to [Jane]. And [Jane] is 1108 as to what happened to [M.Ga.], if that makes sense."

Defense counsel argued M.Gr.'s proposed testimony under Evidence Code section 1108 would be very prejudicial to defendant because the evidence of the charged offenses against Jane and M.Ga. was "particularly weak," so that the jury would rely on M.Gr.'s testimony to "bootstrap" and rely on that evidence to convict him of the charges based on Jane and M.Ga.

The prosecutor replied the evidence was not weak since defendant admitted to Dr. Streeter and family members that he had a sexual relationship with Jane.

The court held the People's proposed propensity evidence under Evidence Code section 1108 was admissible because it was not such "that would bootstrap a conviction where there is very weak evidence in this matter. So I'll allow it."

Also prior to trial, the prosecutor stated that if defendant testified, she would move to impeach him with his prior convictions from the first trial in 2011, based on raping Jane in 2009. The prosecutor stated that the same 2011 convictions were also admissible under Evidence Code section 1108.

Defense counsel objected to using the 2011 prior convictions because they were based on acts committed in 2009 that "postdate the acts in this case," since defendant was being retried on the 2004 charges against Jane and tried for sexually assaulting M.Ga. between 1995 and 1997.

The court held that defendant could be impeached with his prior rape convictions that resulted from the first trial in 2011. Defense counsel stated that defendant had been advised about the impeachment evidence.

### C. *Impeachment of Defendant with the Prior Convictions*

When defendant testified at the second trial, he said on direct examination that he had participated "in the earlier trial regarding these incidents."

On cross-examination, the prosecutor asked defendant about his prior convictions:

"[THE PROSECUTOR] Isn't it true that on December 20, 2011, you were convicted of two counts of rape and one count of incest?

"[DEFENDANT] There was one charge, [section] 261(a)(2). And that's rape. That doesn't have anything to do with incest. It was just the one charge. Four, two and two."

The prosecutor asked defendant to look at a certified copy of the abstract of judgment that showed his convictions, and the document was introduced into evidence. After reviewing the document, defendant conceded that he was convicted of three counts "but I've only seen the [section] 261(a)(2) on all my paperwork."

### D. Instructions

The court instructed the jury with CALCRIM No. 316, that if it found a witness had been convicted of a felony, it could consider that fact in evaluating the credibility of the witness's testimony; the fact of a conviction did not necessarily destroy or impair a witness's credibility, and it was up to the jury to decide whether that fact made the witness less believable.

The court also instructed the jury with CALCRIM No. 1191, about propensity evidence introduced under Evidence Code section 1108:

"The People presented evidence that the defendant committed the crimes of rape, oral copulation, and sexual penetration that were not charged in this case. These crimes are defined for you in these instructions.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit rape by force and sexual penetration by force, as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of rape by force and sexual penetration by force. The People must still prove each charge beyond a reasonable doubt."

### E. Impeachment with Prior Felony Convictions

Defendant argues the court violated his due process rights by allowing the prosecutor to impeach his trial testimony with his prior convictions for raping Jane.

"After the 1982 adoption of article I, section 28, subdivision (f), of the California Constitution, a witness may be impeached with any prior felony conviction involving moral turpitude, subject to the trial court's discretion under Evidence Code section 352 to exclude it if it finds its prejudicial effect substantially outweighs its probative value. [Citation.]" (*People v. Anderson* (2018) 5 Cal.5th 372, 407, 235 Cal. Rptr. 3d 1, 420 P.3d 825; *People v. Clark* (2011) 52 Cal.4th 856, 931, 131 Cal. Rptr. 3d 225, 261 P.3d 243.) Such impeachment may be excluded under Evidence Code section 352 if its probative value is "substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Harrison* (2005) 35 Cal.4th 208, 229, 25 Cal. Rptr. 3d 224, 106 P.3d 895.)

"When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*People v. Clark, supra*, 52 Cal.4th at p. 931.) "Although the similarity between the prior convictions and the charged offenses

19

is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive. [Citations.]" (*Id.* at p. 932.)

"Evidence Code section 788 provides that the credibility of a witness may be attacked by showing a witness has been convicted of a felony. [T]he term 'convicted' includes otherwise qualifying felony convictions suffered even though sentence has not yet been imposed on the charge." (*People v. Martinez* (1998) 62 Cal.App.4th 1454, 1456, 73 Cal. Rptr. 2d 358.) A defendant may be impeached by prior convictions resulting from a guilty verdict or a jury's adjudication of guilt even if the defendant has not been sentenced, and in the absence of an appealable final judgment. (*Id.* at pp. 1460-1464.)

"The admission of a felony conviction for impeachment tests the defendant's credibility as a witness during trial. Whether the offense predated the charged crime has no bearing on its relevance to that issue. [A] prior felony conviction for purposes of impeachment under Evidence Code section 788 means any conviction suffered before trial, regardless of the offense date. [Citations.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 887, 38 Cal. Rptr. 3d 149, 126 P.3d 981 (*Hinton*).)

The court has broad discretion to admit or exclude prior convictions for impeachment purposes, and its decision will not be disturbed absent an abuse of that discretion. (*People v. Anderson, supra,* 5 Cal.5th at p. 407.)

**F. Evidence Code Section 1108**

At the second trial, the prosecutor stated that she also would be introducing defendant's prior convictions based on Evidence Code section 1108. We briefly review the provisions of this statute.

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. [Citations.] This ban against admitting character evidence to prove conduct, however, does not prohibit admission of specific acts of misconduct to establish a material fact like intent, common design or plan, or identity [citation], and does not affect the admissibility of evidence regarding the credibility of a witness [citation]. [Citation.]" (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159, 144 Cal. Rptr. 3d 401, 281 P.3d 390; Evid. Code, § 1101, subds. (a), (b).)

However, Evidence Code section 1108 creates a specific exception to the exclusion of character evidence in cases involving sexual offenses: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a); *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115-1116, 109 Cal. Rptr. 3d 715; *People v. Villatoro, supra,* 54 Cal.4th at pp. 1159-1160.)

"'As the legislative history indicates, the Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes.' [Citation.]" (*People v. Villatoro, supra,* 54 Cal.4th at p. 1160.) Evidence Code section 1108 has been interpreted to permit the introduction of both charged and uncharged prior sexual offenses to prove propensity. (*Id.* at pp. 1160-1164.)

20

"A challenge to admission of prior sexual misconduct under ... sections 1108 and 352 is reviewed under the deferential abuse of discretion standard and will be reversed 'only if the court's ruling was "arbitrary, whimsical, or capricious as a matter of law. [Citation.]" [Citation.]' [Citation.]" (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991, 146 Cal. Rptr. 3d 66.)

### G. Analysis

At defendant's first trial in 2011, he was convicted of rape, rape of a person suffering from a developmental disability, and incest.

As defendant concedes, these are crimes of moral turpitude (*People v. Mazza* (1985) 175 Cal.App.3d 836, 843-844, 221 Cal. Rptr. 640; *People v. Shazier* (2014) 60 Cal.4th 109, 146-147, 175 Cal. Rptr. 3d 774, 331 P.3d 147) and defendant was properly subject to impeachment with these offenses. By the time the second trial began, this court had affirmed the convictions from the prior case and his convictions were final.

As defendant also concedes, he was properly impeached at the second trial with the prior offenses that he committed in 2009, and resulted in the convictions in 2011, even though he committed those prior offenses after he committed the crimes charged at the second trial - the sexual assaults he committed against Jane in 2004 and M.Ga. between 1995 and 1997. (*Hinton, supra*, 37 Cal.4th at p. 887.)

We further find the court properly admitted the prior testimony of M.Gr. pursuant to Evidence Code section 1108, that defendant sexually assaulted her when she was a child and lived in his home in Chowchilla. M.Gr.'s testimony about these sexual assaults was admissible as propensity evidence in the second trial for sexually assaulting her sisters Jane and M.Ga. "'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' [Citations.]" (*People v. Villatoro, supra*, 54 Cal.4th at p. 1164.)

Defendant asserts the court abused its discretion and violated his due process rights by permitting the impeachment evidence because the charges in the prior convictions and current trial were identical and should have been excluded pursuant to *People v. Gurule* (2002) 28 Cal.4th 557, 123 Cal. Rptr. 2d 345, 51 P.3d 224 (*Gurule*). *Gurule* held the trial court abused its discretion when it held that the defendant's trial testimony could be impeached with his prior convictions for rape and murder because they were substantially similar to the charged offense of murder. (*Id.* at pp. 607-609.)

However, defendant's reliance on *Gurule* is misplaced and the California Supreme Court has rejected a similar claim based on *Gurule*. In *Hinton, supra*, 37 Cal.4th 839, the defendant was charged with and convicted of several murders. He relied on *Gurule* and argued that he should not have been impeached with his prior convictions for murder, attempted murder, and assault with a firearm, because his prior offenses should "have been excluded as too similar to the charged crime[s]." (*Hinton, supra*, 37 Cal.4th at p. 888.)

*Hinton* rejected the defendant's reliance on *Gurule* because that case involved "crimes committed prior to the passage of Proposition 8," and the defendant failed to acknowledge the subsequent changes in the law. (*Hinton, supra*, 37 Cal.4th at p. 887.) The defendant's prior convictions in *Hinton* were for offenses of moral turpitude and admissible for impeachment, and his argument that the offenses were too similar to the currently charged crimes was meritless. (*Id.* at p. 888.)

21

"'While before passage of Proposition 8, past offenses similar or identical to the offense on trial were excluded, now the rule of exclusion on this ground is no longer inflexible.' [Citations.] Inasmuch as defendant had no other prior felony convictions available for impeachment, the trial court did not abuse its discretion in admitting these crimes of violence. [Citation.] To do otherwise would have given defendant a "'false aura of veracity.'" [Citations.]" (*Ibid.*, fn. omitted)

Indeed, *Gurule* itself acknowledged that the defendant's crimes in that case occurred prior to the enactment of Proposition 8 and accepted the People's concession that the prior offenses should have been excluded since they were similar to the current charges based on "pre-Proposition 8 law." (*Gurule, supra*, 28 Cal.4th at pp. 607-608.) After the enactment of Proposition 8, however, the fact that prior convictions are identical to the currently charged crimes "no longer compels their exclusion. [Citations.]" (*People v. Tamborrino* (1989) 215 Cal.App.3d 575, 591, 263 Cal. Rptr. 731.) The trial court in this case did not abuse its discretion by permitting the prosecutor to impeach defendant with prior convictions that were similar to the charged offenses in this case.

Defendant further argues the effect of the prior convictions on the jury in this case was "even more pernicious" than the usual impeachment situation because "those crimes involved the same victim" and were for offenses described in detail by Jane at the second trial. Defendant asserts the jury could have surmised Jane's identity as the victim of the prior convictions based on the entirety of the evidence at the second trial:

"The jury knew the Sheriff's Department contacted and investigated [defendant] after [Dr.] Streeter reported him ... for having sex with his daughter in April 2009. The jury learned, via Ralph Cernuda's testimony, that [defendant] had been in the county jail for five years by the time of trial. The jury also learned this was [defendant's] second trial in this matter and that [M.Gr.] had testified at [defendant's] first trial."

Defendant concludes that since his prior convictions were for rape and incest, the jury could not have missed "the obvious fact that these convictions were for the crimes described by [Jane] in the second trial" since he was not charged in the second trial for committing any crimes in 2009. Defendant argues the admission of the prior convictions "not only ... cast doubt" on his veracity and honesty, but also "heightened the perceived credibility of the complaining witness," since the jury would have figured out that a previous jury believed Jane and convicted defendant of raping her.

There are several problems with these arguments. First, the jury was never told that Jane was the victim of the prior convictions, or that another jury had been unable to reach verdicts on the 2004 charges. Second, while the prosecution introduced the abstract of judgment into evidence when defendant initially denied he had three prior convictions, that document did not identify the victim of the prior convictions or whether there was more than one victim.

More importantly, however, the jury asked the court during deliberations: "Are we allowed to know the reason the defendant is incarcerated at this time and who was the victim?" Defense counsel objected to any detailed response to this question because the underlying facts of the prior convictions were not admitted into evidence, even though the existence of the convictions were found admissible. The prosecutor agreed that the People did not introduce any evidence beyond the fact of the convictions themselves and not the underlying details. The court noted the abstract of judgment had been introduced, but it did not identify any victims. The parties agreed with the court's decision to respond, "The defendant was convicted of the charges listed in Exhibit 7," referring to the abstract of judgment, and "[t]here is no other evidence. There was no other evidence admitted regarding this issue." The jury's question thus implies it did not make the connections suggested by defendant.

22

Defendant also argues the court "compounded" the alleged prejudice that resulted from impeachment because the jury was instructed with CALCRIM No. 1191, on the consideration of propensity evidence under Evidence Code section 1108. Defendant's prior convictions for rape and incest were admissible under Evidence Code section 1108. (*People v. Villatoro, supra,* 54 Cal.4th at pp. 1160-1164.) The court correctly gave CALCRIM No. 1191, which instructed the jury on how to consider propensity evidence, and that the jury may, but was not required to, infer from this predisposition that the defendant is likely to commit and did commit the charged offense. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1013, 130 Cal. Rptr. 2d 254, 62 P.3d 601; *People v. Villatoro, supra,* 54 Cal.4th at pp. 1167-1168.)

Finally, defendant asserts these alleged evidentiary errors were prejudicial because the jury in the first case could not reach verdicts on the sexual assault charges based on defendant's conduct in 2004, but the jury in the second trial convicted him of all the charges. Defendant concludes the only difference in the second trial was the jury learned of his prior convictions of rape and incest, and the jury "inevitably would have realized these convictions referred to the 2009 rape and incest described in detail" by Jane. We have already found the court did not abuse its discretion, defendant was properly impeached with the prior convictions, the jury did not know Jane was the victim in the prior convictions, and the evidence was also admissible under Evidence Code section 1108. As to the differences between the first and second trials, the jury in the first case heard far more compelling live testimony when M.Gr. appeared and described what defendant did to her. Indeed, the prosecutor in the first trial, who was called as a defense witness, testified that when M.Gr. appeared at the first trial, she gave "some of the most emotionally impact-ful testimony I have ever experienced," and she looked fearful and kind of "like a frightened animal; she just wanted to get away any way she could." The impact of M.Gr.'s evidence would have been blunted by reading the transcript to the jury at the second trial. It is also possible that Jane, who was developmentally disabled, may have been more comfortable testifying in court compared to the first trial. We also note that at the second trial, defendant's credibility was severely undermined when he refused to admit that he had been convicted of incest, even though he had been advised about the expected impeachment. Defendant continued to deny that he had been convicted of incest until the prosecutor presented the abstract of judgment to him, and then claimed that he only knew about one charge based on his prison paperwork.

We thus conclude the court did not abuse its discretion when it permitted defendant to be impeached with his prior convictions for rape and incest.

People v. Garner, 2019 Cal. App. Unpub. LEXIS 3305, *39-56.

     *a.     Legal Standard and Analysis*

Respondent correctly asserts that Petitioner fails to present a federal claim, since Petitioner is challenging the application and interpretation of state law. It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law"); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). As Respondent details, Petitioner testified at his trial, denied the nature and scope of his prior convictions, and was impeached with evidence of his

prior convictions. (Doc. 13 at 39.) In affirming Petitioner's convictions, the Fifth DCA held that the trial court correctly permitted such impeachment under California Evidence Code §§ 352, 788, and 1108, as well as the California Constitution and state decisional law. People v. Garner, 2019 Cal. App. Unpub. LEXIS 3305, *48-49. It further held that the trial court correctly instructed the jury with CALCRIM No. 1191, governing the jury's consideration of evidence admitted under California Evidence Code § 1108. Id. at *54-55. Insofar as Petitioner challenges the Fifth DCA's interpretation and application of California law, such challenge does not give rise to a federal question cognizable on federal habeas review. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Thus, the claim is not cognizable on federal habeas and should be rejected.

Even if the Court found the claim cognizable, it would be without merit. A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but they are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146-47 (1998). First, Respondent contends, no clearly established federal law supports Petitioner's claim that the trial court violated his due process rights "by allowing the prosecution to impeach him with evidence of his prior rape and incest convictions." (Doc. 13 at 39.) As Respondent asserts, impeachment of a testifying defendant's credibility with his prior conviction is routine under federal law. (Doc. 13 at 40.) Federal Rule of Evidence 609(a) expressly permits such impeachment, and the Supreme Court has approved of impeachment of a testifying defendant's credibility with a prior conviction where, as here, a limiting instruction is provided. (Id.)

Respondent further asserts that the result is no different if this Court looks past the generalized claim in the petition and assumes that Petitioner is claiming that impeachment with his prior convictions violated due process because they were for offenses identical or similar crimes to those being tried. (Doc. 13 at 40; see Doc. 12-20 at 31.) Respondent argues that although Petitioner does not

appear to seek habeas relief on grounds that the state appellate court unreasonably approved of the use of his prior convictions for rape and incest as propensity evidence under California Evidence Code § 1108, the result would be the same if he did. (Doc. 13 at 41.)

Furthermore, Respondent asserts that insofar as Petitioner's instructional claim is based on federal law, his contention that the purported error in allowing impeachment with his prior convictions was "compounded" when the jury was instructed "on prior sex crimes evidence" lacks merit. (Doc. 13 at 42.) Respondent contends that giving an instruction based on CALCRIM No. 1191 could not have "compounded" the alleged evidentiary error because the admission of evidence is a state law matter, and the alleged evidentiary error did not run afoul of clearly established federal law. (Doc. 13 at 42.) Respondent also asserts that lower federal courts have upheld the use of CALCRIM No. 1191 against other due process challenges. (Doc. 13 at 42-43.)

Accordingly, the claim fails to present a cognizable federal claim. Moreover, Petitioner fails to establish that the state court's determination was contrary to or an unreasonable application of Supreme Court authority. The claim should be denied.

2.      Sufficiency of the Evidence

Petitioner also claims that the "prosecution failed to present substantial evidence to prove [Petitioner] raped [M.Ga.] 4 times as charged." (Doc. 1 at 4.) In the last reasoned decision, the Fifth DCA denied the claims as follows:

**II. Substantial Evidence of Counts 3 Through 6**

Defendant was charged and convicted of committing the following offenses against M.Ga. when she was a child under the age of 14 years and more than 10 years younger than defendant:

Counts 3 and 4: rape, between November 15, 1995, and November 14, 1996, "to wit: the first time" and "the last time" (§ 269, subd. (a)(1); § 261, subd. (a)); and

Counts 5 and 6: rape, between November 15, 1996, and November 14, 1997, "to wit: the first time" and "the last time" (§ 269, subd. (a)(1); § 261, subd. (a)).

Defendant contends these convictions must be reversed because the People failed to prove that he raped M.Ga. four times between 1995 and 1997 since M.Ga.'s testimony was generic; M.Ga. only testified that he may have done something more than once; and there was no evidence when or where he committed these offenses.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime ...

25

beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, 75 Cal. Rptr. 3d 289, 181 P.3d 105.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*Ibid.*)

### A. People v. Jones

In *People v. Jones* (1990) 51 Cal.3d 294, 270 Cal. Rptr. 611, 792 P.2d 643 (*Jones*), the California Supreme Court addressed the "difficult questions regarding the extent to which the defendant's due process rights are implicated by the inability of his young accuser to give specific details regarding the time, place and circumstances of various alleged assaults. Frequently, as here, these cases involve the so-called 'resident child molester' [citation], who either lives with his victim or has continuous access to him or her. In such cases, the victim typically testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults." (*Id.* at p. 299.)

"Child molestation cases frequently involve difficult, even paradoxical, proof problems. A young victim ... assertedly molested over a substantial period by a parent or other adult residing in his [or her] home, may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents. (Indeed, even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance. [Citation.]) Accordingly, any constitutional principles or evidentiary standards we develop should attempt to assure that the resident child molester is not immunized from substantial criminal liability merely because he has repeatedly molested his victim over an extended period of time.

"On the other hand, the defendant has a due process right to fair notice of the charges against him and reasonable opportunity to defend against those charges. In addition, the defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged. Finally, the defendant's conviction can be sustained only if supported by substantial evidence." (*Id.* at p. 305.)

*Jones* held that in determining whether a conviction in these cases is supported by substantial evidence, "generic testimony is sufficiently substantial from an evidentiary standpoint. [Citations.]" (*Jones, supra,* 51 Cal.3d at pp. 313-314.) "It must be remembered that even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*Id.* at p. 314.)

*Jones* set forth "the minimum quantum of proof necessary to support a conviction on

26

one or more counts based on such generic testimony." (*Jones, supra*, 51 Cal.3d at p. 314.)

"[I]n determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. [Citations.]

"The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Id.* at pp. 315-316.)

*Jones* further held that "given the availability of the preliminary hearing, demurrer and pretrial discovery procedures, the prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him," or preclude him from presenting a defense. (*Jones, supra*, 51 Cal.3d at pp. 318, 319.)

In *People v. Matute* (2002) 103 Cal.App.4th 1437, 127 Cal. Rptr. 2d 472 (*Matute*), the defendant was convicted of 15 counts of forcible rape committed against his daughter when she was 15 and 16 years old. *Matute* relied on *Jones* and rejected the defendant's arguments that his convictions violated due process because the victim only offered generic testimony and did not give specific details about the time and circumstances of each count. (*Id.* at p. 1439.)

The defendant argued that *Jones's* holding about generic testimony only applied to "course of conduct" charges, such as continuous sexual assault in violation of section 288.5, whereas he was convicted of rape in violation of section 261. *Matute* rejected that argument and held that *Jones's* discussion of generic testimony was not limited to course of conduct charges. (*Matute, supra*, 103 Cal.App.4th at pp. 1444-1446.)

"In summary, the *Jones* court held that, in child molestation cases, as long as the victim specifies the type of conduct involved, its frequency, and that the conduct occurred during the limitation period, nothing more is required to establish the substantiality of the victim's testimony." (*Id.* at p. 1446.)

*Matute* also noted the case involved crimes committed against a victim when she was 15 and 16 years old, "and thus does not fall squarely within the factual parameters of the *Jones* case, which involved molestation of children under the age of 14." (*Matute, supra*, 103 Cal.App.4th at p. 1447.) However, *Matute* held *Jones's* conclusions were fully applicable to the case since the victim had lived with the defendant from birth, she was molested by the defendant from the time she was six years old, and he forced her to have sexual intercourse between the ages of 12 and 16 years. The defendant "may aptly be described as a 'resident child molester.'" (*Ibid.*) The fact that the victim "was 15 and 16 at the time of the crimes involved here makes little difference with regard to her inability to differentiate among the continual rapes perpetrated by defendant." (*Ibid.*)

The victim's testimony "reflected the ongoing, repetitive nature of the rapes which had blurred together in her mind, except for specific occasions such as her birthday, the week after her abortion, the time in October 2000 when he was particularly violent, and the day when she was examined for evidence of rape and appellant's sperm was found inside her body. [The defendant's] only defense was to deny that he ever had sexual intercourse with his daughter." (*Id.* at p. 1450.)

**B. Analysis**

As in *Jones*, we find defendant's convictions in counts 3 through 6 for raping M.Ga. are supported by substantial evidence based on the testimony from M.Ga., M.Gr., and mother.

M.Ga. testified defendant touched her sexually "pretty much all the time. Every chance he got." She described a series of incidents where defendant placed his finger in his vagina, the molestations happened in her bedroom when no one else was there, and defendant did this to her in the daytime and the nighttime, "[w]henever he got a chance." In response to additional questions, M.Ga. testified that defendant put his penis in her mouth and it happened in her bedroom, but it was "gross," and she did not want to talk about it.

M.Ga. testified defendant put his penis inside her vagina, it happened more than once, and he did it "[w]henever he'd get a chance." The first time it happened she was in defendant's bedroom, it was nighttime, no one else was around, and she was in middle school. She could not remember what happened during each incident when he did that act to her, she did not want to talk about it at trial, and it hurt her too much to talk about it. She always told defendant not to do it, but she could not get away from him.

M.Ga. testified defendant never stopped sexually touching her until she ran away from defendant's home in Chowchilla and went to live in her mother's house in Stockton. She believed she was between the seventh and eighth grades when she ran away with M.Gr., and they never returned to defendant's house.

In the course of her testimony, M.Ga. was asked about her prior statements to Sergeant Clark and testified she could not remember what she said. M.Ga. continued that she told the truth and knew "this is no joke. Why would I lie about something like this? And why would somebody ... do time that I'm lying about and I wouldn't."

Mother testified that in the summer of 1998, her daughters M.Ga. and M.Gr. ran away from defendant's home in Chowchilla. M.Ga. was 13 years old and in middle school at that time. M.Ga. told mother that "[t]hey had to get away from their dad because he'd be touching them and messing with them and having them do things ... they didn't want to do. So ... they ran away because nobody would believe them." The testimony of M.Gr. also established the time period where she ran away with M.Ga. to their mother's home.

As required by *Jones*, M.Ga.'s generic testimony about regular and constant acts of sexual intercourse, even though they were "undifferentiated," were sufficient to support his convictions in the four counts. (*Jones, supra*, 50 Cal.3d at p. 314.) The testimony from mother and M.Gr. confirmed the time period for these offenses, and that the incidents ended when M.Gr. and M.Ga. ran away to live with their mother.

While M.Ga. was reluctant to describe the nature of the sexual assaults, she ultimately testified that defendant had performed acts of digital penetration, oral copulation, and sexual intercourse against her, and that he raped her more than once and "[w]henever he got the chance."

28

1    People v. Garner, 2019 Cal. App. Unpub. LEXIS 3305, *56-66.

2              a.      Legal Standard

3         The law on sufficiency of the evidence is clearly established by the United States Supreme

4    Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307

5    (1979), the test on habeas review to determine whether a factual finding is fairly supported by the

6    record is "whether, after viewing the evidence in the light most favorable to the prosecution, any

7    rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

8    Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no

9    rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be

10   entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements

11   defined by state law.  Id. at 324, n. 16.

12        If confronted by a record that supports conflicting inferences, a federal habeas court "must

13   presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

14   conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.  Circumstantial

15   evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters

16   v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

17        After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson

18   with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

19   applying the AEDPA's deferential standard of review, this Court must presume the correctness of the

20   state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

21        In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the

22   highly deferential standard of review in habeas proceedings, by noting that Jackson,

23        makes clear that it is the responsibility of the jury - not the court - to decide what
          conclusions should be drawn from evidence admitted at trial. A reviewing court may set
24        aside the jury's verdict on the ground of insufficient evidence only if no rational trier
          of fact could have agreed with the jury. What is more, a federal court may not overturn a
25        state court decision rejecting a sufficiency of the evidence challenge simply because the
          federal court disagrees with the state court. The federal court instead may do so only if
26        the state court decision was "objectively unreasonable."

27        Because rational people can sometimes disagree, the inevitable consequence of this
          settled law is that judges will sometimes encounter convictions that they believe to be
28        mistaken, but that they must nonetheless uphold.

29

Id. at 2.

       b.     *Analysis*

Viewing the evidence in the light most favorable to the prosecution, the state court's determination that there was sufficient evidence was not unreasonable. Regarding the kinds of acts Petitioner engaged in, the Fifth DCA recounted M.Ga.'s testimony about the various types of sexual acts Petitioner committed against her, including that Petitioner repeatedly put his penis inside her vagina despite her always telling him not to do so. People v. Garner, 2019 Cal. App. Unpub. LEXIS 3305, *64. With respect to the number of acts, the Fifth DCA noted M.Ga.'s testimony that Petitioner touched her sexually "'pretty much all the time'" and "'[e]very chance he got,'" and that he did not stop until M.Ga. ran away from Petitioner's home. Id. She testified that Petitioner put his penis in her vagina, despite her attempts to resist him, more than once and "'[w]henever he'd get a chance.'" Id. She also described details of the first rape, which occurred in Petitioner's bedroom, at nighttime, when nobody else was around, and while she was in middle school. Id. And regarding the general time period, the Fifth DCA pointed to M.Ga.'s testimony about the first rape occurring while she was in middle school and continuing until she and her sister ran away when M.Ga. was between seventh and eighth grade. Id. at *64-65. This testimony about the timeframe was supported by the testimony of M.Gr. and M.Ga.'s mother. Id.

The Fifth DCA reasonably concluded that the evidence proved that Petitioner raped M.Ga. as charged under California law. Petitioner fails to show that no fair-minded jurist would agree with the state court's determination. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the Jackson standard, and the claim should be denied.

## IV.    RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within

thirty days after being served with a copy of this Findings and Recommendation, Petitioner may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 31, 2021**                        **/s/ Jennifer L. Thurston**
CHIEF UNITED STATES MAGISTRATE JUDGE